## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 25-cv-23367-GAYLES/LOUIS

NABIL HASCHEMIE,
FRANCISCO JAVIER BARBERI,
ALEX KATZ,
JEFFREY SCHNEIDER,
BRYAN ARMBRUSTER,
SAMUEL GEMUS,
JUSTIN FRANK HARKNESS,
LEO SUAREZ, and
JONATHAN MCDONALD, individually and on
behalf of all others similarly situated,
      Plaintiffs,

v.                                                JURY TRIAL DEMANDED

DIAGEO NORTH AMERICA, INC.,
a Connecticut corporation,
DIAGEO BEER COMPANY USA,
a Delaware corporation, and
DIAGEO AMERICAS, INC.,
a Delaware corporation,

      Defendants.
_____/

### AMENDED NATIONWIDE CLASS ACTION COMPLAINT

Plaintiffs, Nabil Haschemie ("Mr. Haschemie"), Francisco Javier Barberi ("Mr. Barberi"), Alex Katz ("Mr. Katz"), Jeffrey Schneider ("Mr. Schneider"), Bryan Armbruster ("Mr. Armbruster"), Samuel Gemus ("Mr. Gemus"), Justin Frank Harkness ("Mr. Harkness"), Leo Suarez ("Mr. Suarez"), and Jonathan McDonald ("Mr. McDonald," and collectively, "Plaintiffs"), bring this class action against Defendants, Diageo North America, Inc. ("Diageo NA"), Diageo Beer Company USA ("Diageo BC"), and Diageo Americas, Inc. ("Diageo Americas," and together with Diageo NA and Diageo BC, "Diageo" or "Defendants"), on behalf of all consumers that have purchased falsely marketed tequila from Defendants' Casamigos and Don Julio tequila brands.

# I.    <u>INTRODUCTION</u>

1.    In the world of tequila, the *tequilana weber* blue variety of agave ("Blue Weber agave") is regarded as the gold standard. Indeed, the Blue Weber agave variety is the sole variety used in the production of true tequila. Blue Weber agave is native to Jalisco, Mexico and certain surrounding areas.

2.    Blue Weber agave production is highly regulated, and consumers pay a premium for agave spirits made from 100% Blue Weber agave as a result. By way of example, Blue Weber agave takes longer to harvest because it must be grown and harvested once the plants reach full maturity (which can take 5 to 10 years). The plants must also be grown and harvested within certain areas, and specific traditional harvesting practices must be employed. These restrictions are enforced by the Tequila Regulatory Council and are meant to protect the authenticity and quality of tequila and ensure that tequila produced outside the designated geographic regions cannot be labeled as such.

3.    Tequila is made from the heart of the blue agave plant, commonly referred to as the piña. The piña is heated to break down its complex sugars, and crushed to extract its sugary juice, which is then fermented with yeast, transforming those sugars into agave-derived ethanol (alcohol), which is distilled into tequila.

4.    Defendants market the Casamigos tequila brand as a "super-premium tequila brand," and the Don Julio tequila brand as a "*luxury* tequila."

5.    The Casamigos tequila brand carries five agave spirits that Defendants categorize as "Tequila 100% Agave Azul" from Jalisco, Mexico on the face of the bottles: Blanco, Casamigas

Jalapeño, Reposado, Cristalino, and Añejo ("Casamigos Tequilas").[1] The Casamigos Tequilas

begin with the initial distillation of Casamigos Blanco, which serves as the foundation for the entire

line of Casamigos Tequilas.



6.      Defendants further represent that Blue Weber is the sole blue agave variety used

for the Casamigos Tequilas.[2]

---

[1] Casamigos Our Tequilas, https://www.casamigos.com/en-us/our-tequilas (last visited May 15, 2025).

[2] Casamigos Blanco, https://www.casamigos.com/en-us/our-tequilas/blanco (last visited May 15, 2025); Casamigos Casamigas, https://www.casamigos.com/en-us/our-tequilas/casamigas (last visited May 15, 2025); Casamigos Reposado, https://www.casamigos.com/en-us/our-tequilas/reposado (last visited May 15, 2025); Casamigos Cristalino, https://www.casamigos.com/en-us/our-tequilas/cristalino (last visited May 15, 2025); Casamigos Añejo, https://www.casamigos.com/en-us/our-tequilas/anejo (last visited May 15, 2025).

**AGAVE:**
Our agaves are 100% Blue Weber.

7.      The Don Julio tequila brand carries nine agave spirits that Defendants categorize as tequila: Blanco, Reposado, Añejo, 70 Cristalino, Alma Miel, Rosado, 1942, Ultima Reserva, and Primavera (collectively, "Don Julio Tequilas").[3] The Don Julio Tequilas begin with the initial distillation of Don Julio Blanco, which serves as the foundation for the entire line of Don Julio Tequilas.



8.      Defendants represent that each of their tequilas are made from 100% Blue Weber agave and includes the following in the description for each of its tequilas on its website.[4]

---

[3]      Don    Julio    Our    Tequilas,    https://www.donjulio.com/our-tequilas?ds_e=GOOGLE&ds_c=25000671_Brand_DOJUO_DONJUB_SA3_GADW_USA_NU _BMC_AO_SEAH_PSEAC_TEAD_NU_ALBOS_NAT_NU_CPC_NU_KEW_A21%2B_CXD _EN_EXPH_BRAD&ds_k=don+julio+tequila&gad_source=1&gad_campaignid=20860144533 &gbraid=0AAAAADkwpxjN1n5gQXpdsDNkhTIpxnMTn&gclid=EAIaIQobChMI1e65veOjjQ MVmbBaBR3-eQegEAAYASAAEgIwqPD_BwE&gclsrc=aw.ds (last visited May 15, 2025).
[4] Don Julio Blanco, https://www.donjulio.com/our-tequilas/don-julio-blanco-tequila (last visited May 15, 2025); Don Julio Reposado, https://www.donjulio.com/our-tequilas/don-julio-reposado-tequila (last visited May 15, 2025); Don Julio Añejo, https://www.donjulio.com/our-tequilas/don-julio-anejo-tequila    (last    visited    May    15,    2025);    Don    Julio    70    Cristalino, https://www.donjulio.com/our-tequilas/don-julio-70-cristalino-tequila (last visited May 15, 2025); Don Julio Alma Miel, https://www.donjulio.com/our-tequilas/don-julio-alma-miel (last visited May 15, 2025); Don Julio Rosado, https://www.donjulio.com/our-tequilas/don-julio-rosado (last



9.      Plaintiffs and others similarly situated paid premium prices for Casamigos Tequilas and Don Julio Tequilas (collectively, the "Products") in reliance on Defendants' representations that the Products were created from 100% Blue Weber agave. But Plaintiffs failed to receive the premium product promised by Defendants despite paying premium prices. Indeed, an investigation of the Products has uncovered that they contain concentrations of ethanol *not derived from agave plants*, and, as such, they were enhanced with ethanol other than that obtained from *tequilana weber* blue variety agave.

10.     If Plaintiffs and others similarly situated had known the truth of the ingredients in the Products, they would not have purchased the Products or would have paid less, and still hope to purchase these products in the future when they are truly 100% agave. For these reasons, and as further detailed below, Plaintiffs bring this claim on their own behalf and on behalf of other consumers of Diageo's Products.

## II.      PARTIES

**Plaintiffs**:

11.     ***Plaintiff, Nabil Haschemie.*** Mr. Haschemie is a resident and citizen of Florida and is otherwise *sui juris*. As detailed below, Mr. Haschemie purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Florida, such as Total Wine &

---

visited May 15, 2025); Don Julio Primavera, https://www.donjulio.com/our-tequilas/don-julio-1942-tequila; Don Julio Ultima Reserva, https://www.donjulio.com/our-tequilas/don-julio-ultima-reserva (last visited May 15, 2025); https://www.donjulio.com/our-tequilas/don-julio-primavera (last visited May 15, 2025).

More, for the last 5 years. Specifically, Mr. Haschemie has purchased Casamigos Añejo, Don Julio 1942, and Don Julio Añejo 70th Anniversary Cristalino. By way of example, on July 24, 2022, Mr. Haschemie purchased Don Julio 1942 and Don Julio Añejo 70th Anniversary from Total Wine & More. *A true and correct copy of Mr. Haschemie's receipt for this transaction is attached as Exhibit A.* By way of further example, on May 14, 2025, Mr. Haschemie purchased Casamigos Añejo from Total Wine & More. *A true and correct copy of Mr. Haschemie's receipt for this transaction is attached as Exhibit B.*

12.     Mr. Haschemie purchased these Products after performing online research to identify premium and pure tequila and reviewing the Products' labels in store. Mr. Haschemie purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Haschemie read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Haschemie purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Haschemie, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Haschemie known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

13.     ***Plaintiff, Francisco Javier Barberi.*** Mr. Barberi is a resident and citizen of Hawaii and is otherwise *sui juris*. As detailed below, Mr. Barberi purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Hawaii, such as at Safeway in Kahului, Hawaii, for the last 5 years. By way of example, on August 6, 2025, Mr. Barberi

purchased Don Julio 70 Cristalino and Casamigos Cristalino from Safeway. *A true and correct copy of Mr. Barberi's receipt for this transaction is attached as Exhibit C.*

14.     Mr. Barberi purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in store. Mr. Barberi purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Barberi read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Barberi purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Barberi, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Barberi known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

15.     ***Plaintiff, Alex Katz.*** Mr. Katz is a resident and citizen of Louisiana and is otherwise *sui juris.* As detailed below, Mr. Katz purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Louisiana, such as Total Wine & More, for the last 5 years. As just one example, on August 13, 2025, Mr. Katz purchased Casamigos Blanco and Don Julio Blanco from Total Wine & More through DoorDash. *A true and correct copy of Mr. Katz's receipt for this transaction is attached as Exhibit D.*

16.     Mr. Katz purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels. Mr. Katz purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Katz

read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Katz purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Katz, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Katz known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

17.     ***Plaintiff, Jeffrey Schneider.*** Mr. Schneider is a resident and citizen of Illinois and is otherwise *sui juris*. As detailed below, Mr. Schneider purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Illinois, such as Binny's Beverage Depot, for the last 5 years. By way of example, on August 1, 2025, Mr. Schneider purchased Casamigos Blanco and Don Julio Reposado from Binny's Beverage Depot. *A true and correct copy of Mr. Schneider's receipt for this transaction is attached as Exhibit E.*

18.     Mr. Schneider purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in store. Mr. Schneider purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Schneider read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Schneider purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Schneider, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he

purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Schneider known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

19.     ***Plaintiff, Bryan Armbruster.*** Mr. Armbruster is a resident and citizen of California and is otherwise *sui juris*. As detailed below, Mr. Armbruster purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in California, such as Cine Café in the Gaslamp, for the last 5 years. By way of example, on July 1, 2025, Mr. Armbruster purchased Casamigos Añejo and Don Julio Reposado from Adams Wine & Spirits. *A true and correct copy of Mr. Armbruster's receipt for this transaction is attached as Exhibit F.*

20.     Mr. Armbruster purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in store. Mr. Armbruster purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Armbruster read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Armbruster purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Armbruster, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Armbruster known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

21.     ***Plaintiff, Samuel Gemus.*** Mr. Gemus is a resident and citizen of Colorado and is otherwise *sui juris*. As detailed below, Mr. Gemus purchased various Products from retail, liquor

stores, bars and restaurants authorized to sell the Products in Colorado, such as El Jebel Liquors in Carbondale, for the last 5 years. By way of example, on August 11, 2025, Mr. Gemus purchased Don Julio Reposado and Casamigos Reposado from El Jebel Liquors. *A true and correct copy of Mr. Gemus's receipt for this transaction is attached as Exhibit G.*

22.    Mr. Gemus purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in the store. Mr. Gemus purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Gemus read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Gemus purchased the Products, he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Gemus, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Gemus known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

23.    ***Plaintiff, Justin Frank Harkness.*** Mr. Harkness is a resident and citizen of Texas and is otherwise *sui juris*. As detailed below, Mr. Harkness purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Texas, such as West Woods Liquor in Austin, for the last 5 years. Specifically, Mr. Harkness has purchased Casamigos Blanco and Don Julio Blanco. By way of example, on August 16, 2025, Mr. Harkness purchased Casamigos Blanco and Don Julio Blanco from West Woods Liquor in Austin, Texas. *A true and correct copy of Mr. Harkness's receipt for this transaction is attached as Exhibit H.*

24.     Mr. Harkness purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in store. Mr. Harkness purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Harkness read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Harkness purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Harkness, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Harkness known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

25.     ***Plaintiff, Leo Suarez.*** Mr. Suarez is a resident and citizen of Georgia and is otherwise *sui juris*. As detailed below, Mr. Suarez purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Georgia, such as Habits Bottle Shop and The Wine Shop at Parkaire, for the last 5 years. Specifically, Mr. Suarez has purchased Casamigos Blanco and Don Julio Blanco. By way of example, on August 12, 2025, Mr. Suarez purchased Casamigos Blanco from Habits Bottle Shop. *A true and correct copy of Mr. Suarez's receipt for this transaction is attached as Exhibit I.* By way of example, on August 12, 2025, Mr. Suarez purchased Don Julio Blanco from The Wine Shop at Parkaire. *A true and correct copy of Mr. Suarez's receipt for this transaction is attached as Exhibit J.*

26.     Mr. Suarez purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in store. Mr. Suarez purchased these Products,

in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. Suarez read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. Suarez purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. Suarez, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. Suarez known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

27.    ***Plaintiff, Jonathan McDonald.*** Mr. McDonald is a resident and citizen of Pennsylvania and is otherwise *sui juris*. As detailed below, Mr. McDonald purchased various Products from retail, liquor stores, bars and restaurants authorized to sell the Products in Pennsylvania, such as Fine Wine & Good Spirits, for the last 5 years. Specifically, Mr. McDonald has purchased Casamigos Blanco and Don Julio Reposado. By way of example, on August 13, 2025, Mr. McDonald purchased Casamigos Blanco and Don Julio Reposado from Fine Wine & Good Spirits. *A true and correct copy of Mr. McDonald's receipt for this transaction is attached as Exhibit K.*

28.    Mr. McDonald purchased these Products after viewing marketing and advertisements from Defendants and reviewing the Products' labels in store. Mr. McDonald purchased these Products, in part, because they purportedly were created from 100% Blue Weber agave. Prior to purchase, Mr. McDonald read and relied on Defendants' representation that the Products were "Tequila 100% Agave Azul." When Mr. McDonald purchased Casamigos Tequilas and Don Julio Tequilas he was unaware that Defendants had misrepresented the composition and

ingredients of the Products, such that he would not have purchased the Products or would not have paid as much for them as he did. Mr. McDonald, at all times, believed, as a result of Diageo's representations both online and on the packaging of the Products he purchased, that the tequila he purchased was premium and pure tequila made of 100% Blue Weber agave. Had Mr. McDonald known the Products were not 100% Blue Weber agave, he would not have purchased the Products or would have paid less than he did.

**Defendants**:

29.    ***Defendant, Diageo North America, Inc.*** Diageo NA is a Connecticut corporation headquartered in New York and manufactures and markets the Products at issue in this litigation. Diageo NA engages in business throughout the United States and is registered as a foreign profit corporation in various states, including with the Florida Department of State, Louisiana Secretary of State, Illinois Secretary of State, California Secretary of State, Texas Secretary of State, and Pennsylvania Department of State.

30.    Diageo NA proudly explains that it has over 200 brands and sales in nearly 180 countries and offers "something for every taste and celebration."[5]

31.    Diageo NA has no less than five distinct tequila brands under its corporate umbrella: Don Julio, Casamigos, Astral, DeLeón, and 21 Seeds.

32.    Diageo NA explains on its website that "[i]n F23, our tequila net sales grew 19%, driven by Don Julio and Casamigos in North America, and we're well positioned to bring this increasingly popular spirit to consumers worldwide."[6]

---

[5] Our Brands – Brand explorer, Diageo, https://www.diageo.com/en/our-brands/brand-explorer (last visited May 15, 2025).
[6] Our Brands – Tequila, Diageo, https://www.diageo.com/en/our-brands/tequila (last visited May 15, 2025).

33. ***Defendant, Diageo Beer Company USA.*** On information and belief, Diageo BC is a Delaware corporation headquartered in New York and manufactures and markets the Products at issue in this litigation. Diageo BC engages in business throughout the United States and is registered as a foreign profit corporation in various states, including with the Florida Department of State, Louisiana Secretary of State, Hawaii Department of Commerce and Consumer Affairs, Illinois Secretary of State, California Secretary of State, Texas Secretary of State, Georgia Secretary of State, and Pennsylvania Department of State.

34. ***Defendant, Diageo Americas, Inc.*** On information and belief, Diageo Americas is a Delaware corporation headquartered in New York and manufactures and markets the Products at issue in this litigation. Diageo Americas engages in business throughout the United States and is registered as a foreign profit corporation in various states, including with the Florida Department of State, Louisiana Secretary of State, Illinois Secretary of State, California Secretary of State, Colorado Secretary of State, Texas Secretary of State, Georgia Secretary of State, and Pennsylvania Department of State.

## III.    JURISDICTION AND VENUE

35.    This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(a)(1) because Plaintiffs have a good-faith basis for an amount in controversy that exceeds the sum or value of $75,000, exclusive of interest and costs, and because the matter is between citizens of different states. In addition, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(A) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative class members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Diageo are citizens of different states.

36.     This Court has personal jurisdiction over Diageo because it has substantial aggregate contacts with this District, including engaging in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including by marketing and selling the Products to consumers in this Judicial District, by placing the Products into the stream of commerce directed at this Judicial District, and because Diageo purposely availed itself of the laws of the State of Florida by marketing and distributing the Products within Miami-Dade County, Florida and the State of Florida. Defendant's purposeful availment and extensive contacts with Florida renders the exercise of jurisdiction by this Court over it permissible under traditional notions of fair play and substantial justice.

37.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because Diageo transacts business within this District and Diageo has intentionally availed itself of the laws and markets within this District.

38.     All conditions precedent to this action have occurred, been performed, or have been waived.

## IV.     FACTUAL ALLEGATIONS

39.     ***Diageo and the Tequila Market.*** Diageo boasts that its early bets on tequila are paying off as tequila is the fastest-growing spirits category at plus-9%.[7] Diageo's CEO has further indicated that the tequila market has grown at plus-6% in the United States in recent years.[8] Tequila's popularity among consumers stems from several factors including its versatility; its perception as a "healthier" or "cleaner" choice than other spirits; a growing trend of consumers

---

[7] *Taking tequila around the world*, Diageo: News & Media (Aug. 1, 2024), https://www.diageo.com/en/news-and-media/stories/2024/taking-tequila-around-the-world.
[8] Nicola Carruthers, *Diageo goes 'back to basics' with Casamigos*, The Spirits Business (Feb. 6, 2025), https://www.thespiritsbusiness.com/2025/02/diageo-goes-back-to-basics-with-casamigos/.

seeking authentic and premium beverage experiences; its cultural connection to Mexico; and the significant role of social media marketing and celebrity endorsements in expanding tequila's appeal. Upon information and belief, the states responsible for the highest sales of nine (9) liter cases of tequila are: California, Texas, Florida, Illinois and Arizona.[9]

40.    ***The Regulation of Tequila Manufacturing and Labeling.*** Like champagne and cognac, tequila is a product of *origin*. Tequila can only legally be made in Mexico: specifically, in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato. Mexico regulates the manufacturing of tequila through the Tequila Regulatory Council, *Consejo Regulador del Tequila, A.C.*, ("CRT"), which is the Conformity Assessment Body for NOM-006-SCFI-2012-Alcoholic Beverages-Tequila-Specifications ("Tequila NOM").[10]

41.    The Tequila NOM in section 6.1.1.1 states that the addition of sugar-based syrups "must not be more than 1% in relation to the total Tequila weight before it is bottled."

42.    Under section 5.1.1 of the Tequila NOM, a product labeled "100% agave [azul]" or "100% de agave" is "a product whose fermentation may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety Agave grown in the territory specified in the Declaration" (i.e., in the states of Jalisco, Tamaulipas, Nayarit, Michoacán and Guanajuato).

43.    "100% agave" tequila, as expressly defined in NOM 5.1.1 is different from "Tequila" as defined in NOM 5.1.2. A key distinguishing difference between 100% agave tequila and "tequila" is that "tequila" may have "other sugars in a proportion not to exceed 49% of total reducing sugars expressed in units of mass. This maximum enhancement of up to 49% of total

[9] *An overview of the Tequila market in the U.S.*, Park Street (October 9, 2024), https://www.parkstreet.com/an-overview-of-the-tequila-market-in-the-u-s/#:~:text=are%3A
[10] *Official Mexican Standard NOM-006-SCFI-2012 Alcoholic Beverages -Tequila - Specifications Courtesy Translation*, https://www.crt.org.mx/wp-content/uploads/2024/01/NOM-006-SCFI-2012%20-%20INGLES.pdf.

reducing sugars expressed in units of mass may not be done with sugars from any species of Agave." However, "[t]he 51% of total reducing sugars expressed in units of mass may only be enhanced with *tequilana weber* blue variety agave . . . ." *See also* NOM section 6.3 (only authorizing tequila that is not 100% agave azul from being "enhanced with other sugars in the fermentation process").

44.     As such, to be labeled as "100% de agave," "100% puro de agave," "100% agave," or "100% puro agave" the product *may not be enhanced with sugars* other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

45.     In short, no sugars other than those obtained from the *tequilana weber* blue variety should be found in a tequila labeled as 100% agave.

46.     Lastly, section 6.5.2.1 requires strict documentation to ensure that tequila "has not been adulterated in the manufacturing stages of its production."

47.     A tequila labeled as 100% agave will be deemed to have been adulterated in the manufacturing stages of its production if it was not made exclusively from Blue Weber agave sugars. The presence of other sugars impacts the tequila's quality and taste given that the use of other sugars can alter the natural flavor profile of tequila.

48.     Bottles of agave spirits that fail to provide accurate information in interstate commerce violate the Federal Alcohol Administration Act ("FAAA"), 27 U.S.C. § 205(e), which requires bottles to provide the "identity and quality of the products" and "the alcoholic content thereof," and 27 U.S.C. § 205(f), which requires advertisements of distilled spirits to "provide the consumer with adequate information as to the identity and quality of the products advertised."

49.    Tequila is additionally regulated in the United States by the U.S. Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau pursuant to 27 C.F.R. Part 5, which regulates the labeling and advertising of distilled spirits.

50.    An agave spirit can only be categorized as tequila where it is "made in Mexico, in compliance with the laws and regulations of Mexico governing the manufacture of Tequila for consumption in that country." 27 C.F.R. § 5.148.

51.    A distilled spirit made from agave plants may only contain added flavoring or coloring materials if they "do not total more than 2.5 percent by volume of the finished product." 27 C.F.R. § 5.155.

52.    ***Widespread Reports of Tequila Adulteration.*** Tequila manufacturing requires the cultivation, fermentation, and distillation of Blue Weber agave, and because this type of agave takes five to ten years to mature for harvest, this "creates ongoing tension in the industry, as well as the temptation to cut corners."[11]

53.    According to Remberto Galván Cabrera, a spokesperson for the Mexican Agave Council, "when agave prices were high, large tequila companies began mixing cane alcohol into tequila that they sold as 100% agave."[12] These practices have not ceased.[13]

54.    Consumers have also raised their suspicions that there is significant adulteration of tequila that is exported from Mexico through social media, community-driven forum-style websites, and blind tasting tests.

---

[11] Felisa Rogers, *What are you drinking? Agave farmers allege tequila industry corruption*, Mezcalistas (Jan. 13, 2025), https://www.mezcalistas.com/tequila-industry-corruption/.
[12] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.
[13] *See id.*

55.    ***Nuclear Magnetic Resonance Testing Confirms Adulteration of the Products.*** To verify the falsity of Diageo's representations, Plaintiffs commissioned Nuclear Magnetic Resonance ("NMR") laboratory testing to confirm, by way of carbon isotope ratio analysis, whether the Products Plaintiffs purchased have been adulterated with cane alcohol.

56.    This technique, which is widely accepted in food chemistry, identifies the plant origin of ethanol in a spirit by measuring the natural carbon fingerprint of the ethanol in the spirit. This fingerprint—known as a stable carbon isotope ratio ($\delta^{13}C$) –can be used to identify the plant source of the sugars used in fermentation.

57.    Specifically, the carbon composition is analyzed at two parts of the ethanol molecule: the methylene group ($CH_2$) and the methyl group ($CH_3$). Ethanol made from Blue Weber agave, a CAM49 plant, shows a distinct isotope signature compared to cheaper feedstocks like corn or sugarcane, which are $C_4$ plants.[14]

58.    A foundational 2010 study confirmed this distinction and the ability to differentiate authentic 100% agave tequila when applying the analysis to tequila products. When applied to tequila, this technique detects the adulteration of tequila labeled as 100% agave by identifying the presence of ethanol made from a source other than Blue Weber agave. By way of example, ethanol made from $C_4$ plants such as corn and sugarcane consistently shows $\delta^{13}C(CH_2)$ values near – 13.5‰.[15] In contrast, agave-derived ethanol falls within a range of –7.0‰ to –9.0‰.[16]

59.    The results of the testing commissioned by Plaintiffs confirmed that Plaintiffs purchased tequila from Diageo that did not meet the United States' or Mexico's regulatory

---

[14] *See* Freddy Thomas, et al., *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. AGRIC. FOOD CHEM. 11580, 11580-81 (2010).
[15] *Id.* at 11583.
[16] *Id.*

requirements for tequila labeled as 100% agave. Plaintiffs tested tequila samples purchased from retail stores in the United States, which yielded the following results: Casamigos Añejo $\delta^{13}C(CH_2)$ value of -10.3 (± 0.5)% and Don Julio Reposado $\delta^{13}C(CH_2)$ value of -11.6 (± 0.5)%. As such, the isotopic parameters measured were not in agreement with the tested samples' description of 100% agave.

60.     The testing results for Casamigos Añejo implicate the entire range of Casamigos Tequilas as they are created from the same base spirit. Similarly, the testing results for Don Julio Reposado implicate the entire range of Don Julio Tequilas as they are created from the same base spirit.

61.     Plaintiffs purchased the Products based on Diageo's representations and would not have paid premium prices but for Diageo's false and misleading statements and omissions.

62.     Plaintiffs intend to purchase Diageo's Products again under the current labeling once they understand the products to truly contain 100% agave and seek the Court's assistance by way of injunctive relief to ensure that Diageo's representations regarding its Products are accurate.

## V.     TOLLING ALLEGATIONS

63.     Plaintiffs and other Class members reasonably relied on Diageo's representations and could not have discovered, through the exercise of reasonable due diligence, that Diageo was misrepresenting and concealing the true nature of the Products.

64.      On or about January 13, 2025, agave spirit journalist Felisa Rogers with *Mezcalistas.com* published the English-language article, *Is that really tequila you're buying? Allegations of corruption raise serious questions.*[17] This article covered the prior week's large-

---

[17] Felisa Rogers, *Agave farmers say they will no longer play nice*, Mezcalistas (Jan. 15, 2025), https://www.mezcalistas.com/breaking-tequila-news/.

scale, peaceful protest by agave farmers in the historic central square of Tequila, Jalisco, where members of the Mexican Agave Council, and *agaveros* (agave farmers) from several states convened to make demands on the tequila industry, including *inter alia:* "*NO MAS TEQUILA ADULTERADO!!!*" (translation- NO MORE ADULTERATED TEQUILA!!!), and "*EL TEQUILA DEVE SER 100 % AGAVE!!*" (translation-TEQUILA MUST BE 100% AGAVE!!").[18]



65.    Only after that public protest and the subsequent coverage by *Mezcalistas* and other trade publications, could Plaintiffs or other Class members reasonably have learned of the adulteration of purported 100% agave tequila with other forms of alcohol.

66.    For these reasons, the applicable statutes of limitations for all claims should be tolled until at least January 13, 2025.

## VI.    CLASS ALLEGATIONS

67.    Plaintiffs bring this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined classes:

---

[18] *Id.*

**A.** <u>**The Nationwide Class**</u>**:** All persons in the United States who purchased one or more of the Products during the applicable statute of limitations period.

**B.** <u>**The Florida Subclass**</u>**:** All persons who purchased one or more of the Products in Florida during the applicable statute of limitations.

**C.** <u>**The Hawaii Subclass**</u>**:** All persons who purchased one or more of the Products in Hawaii during the applicable statute of limitations.

**D.** <u>**The Louisiana Subclass**</u>**:** All persons who purchased one or more of the Products in Louisiana during the applicable statute of limitations and repose.

**E.** <u>**The Illinois Subclass**</u>**:** All persons who purchased one or more of the Products in Illinois during the applicable statute of limitations and repose.

**F.** <u>**The California Subclass**</u>**:** All persons who purchased one or more of the Products in California during the applicable statute of limitations and repose.

**G.** <u>**The Colorado Subclass**</u>**:** All persons who purchased one or more of the Products in Colorado during the applicable statute of limitations and repose.

**H.** <u>**The Texas Subclass**</u>**:** All persons who purchased one or more of the Products in Texas during the applicable statute of limitations and repose.

**I.** <u>**The Georgia Subclass**</u>**:** All persons who purchased one or more of the Products in Georgia during the applicable statute of limitations and repose.

**J.** <u>**The Pennsylvania Subclass**</u>**:** All persons who purchased one or more of the Products in Pennsylvania during the applicable statute of limitations and repose.

68.     Excluded from each class are Diageo, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; the judicial officers and their immediate family members and

associated court staff assigned to this case; and persons who properly execute and file a timely request for exclusion from the Class.

69.     The classes described in this Complaint may be jointly referred to as the "Class" or "Classes" and members of the proposed classes may be jointly referred to as "Class members." Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity, further division into subclasses, or with limitation to particular issues as discovery and the orders of this Court warrant. In addition, the Court can define the Classes and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class members if, based on discovery of additional facts, the need arises.

70.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Diageo has acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief and damages appropriate with respect to the Classes as a whole. Diageo continues to falsely market the Products as tequila made from 100% agave despite using sugars that were not derived from the Blue Weber agave variety.

71.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

72.     As set forth in detail below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

**Numerosity/Manageability**

73.     This action satisfies the requirements of Rule 23(a)(1).  The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, Class members number in the thousands. Diageo sells millions of cases of its tequila

Products each year. The precise number or identification of members of the Class is presently unknown to Plaintiffs, but may be ascertained from (i) Defendants' books and records, (ii) the books and records of third-party retailers that maintain records of Class member purchases and contact information, and (iii) industry statistics. By way of example, upon information and belief, Florida is the third largest consumer of tequila in the United States.[19]

74.     Plaintiffs anticipate providing appropriate notice to Class members in compliance with Rule 23. By way of example, Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, email, text messages, social media, online advertisements, and/or published notice.

**<u>Commonality</u>**

75.     This action satisfies the requirements of Rule 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each member of the Classes.  These common questions predominate over any questions affecting only individual Class members. The predominating common or Class-wide fact questions include, without limitation:

   a.   Whether Diageo's marketing of their tequila Products was likely to deceive or mislead reasonable consumers;

   b.   Whether Diageo was negligent in marketing their Products as 100% Blue Weber Agave;

   c.   Whether Diageo engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices by marketing their Products as 100% Blue Weber agave;

   d.   Whether Diageo was unjustly enriched;

---

[19] Jan Conway, *U.S. Tequila Consumption 2023, By State*, Statista (Feb. 13, 2025), https://www.statista.com/statistics/486797/tequila-consumption-united-states-by-state/#:~:text=In%202023%2C%20tequila%20consumption%20in,ranking%20second%20and%20third%20respectively.&text=Tequila%2C%20an%20agave%2Dbased%20distilled,beverages%20in%20the%20United%20States.

e.  Whether Diageo violated the consumer protection statutes and common law causes of action alleged herein; and

f.  Whether damages, restitution, equitable, injunctive, declaratory, or other relief is warranted.

**Typicality**

76.    This action satisfies the requirements of Rule 23(a)(3) because Plaintiffs' claims are typical of the claims of each of the Class members, as all Class members were and are similarly affected and their claims arise from the same wrongful conduct of Diageo.

77.    Each Class member purchased one or more of Diageo's tequila Products and thus as a result has sustained, and will continue to sustain, damages in the same manner as Plaintiffs. The relief Plaintiffs seek in this action is typical of the relief sought for the absent Class members.

**Adequacy of Representation**

78.    This action satisfies the requirements of Rule 23(a)(4).  Plaintiffs will fairly and adequately protect the interests of the Class members.  Plaintiffs are committed to the vigorous prosecution of this action and there is no hostility or conflict between or among Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

79.    To prosecute this case, Plaintiffs have chosen the undersigned law firm, who has substantial experience in the prosecution of large and complex class action litigation and has the financial resources to meet the costs associated with the vigorous prosecution of this type of litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of all Class members.

**Superiority/Predominance**

80.    This action satisfies the requirements of Rule 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class members.

The joinder of individual Class members is impracticable because of the vast number of Class members who own or have purchased any of the Products.

81.    Because the monetary damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Diageo, by even a small fraction of the Class members, would be enormous.

82.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class member.  The benefits to the legitimate interests of the parties, the court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternative procedures for handling the class action given the particular circumstances.

83.    Plaintiffs are unaware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  The damages or other financial detriment suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Diageo, so it would be impracticable for Class members to individually seek redress for Diageo's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and

increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

## VII.  CLAIMS FOR RELIEF

### COUNT I – COMMON LAW NEGLIGENCE
**(On behalf of Plaintiffs and the Nationwide Class against Defendants)**

84.     Plaintiffs incorporate by reference paragraphs 1 through 83 as though fully set forth herein.

85.     Diageo knew that despite being marketed, certified, advertised, and labeled 100% agave, the Products were adulterated or improperly enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

86.     Diageo owed Plaintiffs and the Nationwide Class the duty of reasonable care, which they breached.

87.     Specifically, Diageo owed a duty to Plaintiffs and the Nationwide Class members to disclose that the Products are not 100% agave because it possessed exclusive knowledge that the Products were adulterated, intentionally concealed the true nature of the Products, and made misleading representations regarding the source of the sugars used in the Products. Diageo further owed a duty to ensure that the Products were not adulterated.

88.     Diageo breached the duty owed to Plaintiffs and the Nationwide Class in intentionally concealing material facts regarding the true nature of the Products, making misleading representations regarding the nature of the Products, and otherwise failing to disclose the same.

89.    Diageo's knowing, intentional, or otherwise reckless misrepresentations and omissions were material in that a reasonable consumer would have considered them important in deciding whether to purchase the Products. Indeed, Plaintiffs reviewed, considered, and relied on Diageo's representations that the Products were 100% agave in deciding whether to purchase them. Plaintiffs and the Nationwide Class members' reliance was reasonable.

90.    Absent Diageo's misrepresentations and omissions, Plaintiffs and the Nationwide Class members would not have purchased the Products or would not have paid premium prices for the Products.

91.    As a result of Diageo's breach of its legal duties, Plaintiffs and the Nationwide Class members suffered actual damages, that arose from the natural and foreseeable consequences of Diageo's conduct, in that the adulterated Products were not 100% agave, and, therefore, were not worth the premium price Plaintiffs and Nationwide Class members paid.

## COUNT II – NEGLIGENT MISREPRESENTATION
### (On behalf of Plaintiffs and the Nationwide Class against Defendants)

92.    Plaintiffs incorporate by reference paragraphs 1 through 83 as though fully set forth herein.

93.    Diageo represented on its website that it used 100% Blue Weber agave to create its Products.

94.    Diageo further misrepresented that its Casamigos Tequilas are "small batch, ultra-premium tequilas … made from the finest hand-selected 100% Blue Weber agaves."

95.    Further, each bottle of Casamigos and Don Julio expressly represents that they are 100% agave tequilas.

96.    Diageo has continued to make these misrepresentations of material facts to date.

97.    At the time, Diageo either knew or should have known it was making misrepresentations of material facts or made the representations without knowledge of their truth or falsity.

98.    Diageo's misrepresentations were made with the intent to induce consumers to purchase its Casamigos Tequilas and Don Julio Tequilas over Diageo's competitors' tequila products who did not offer 100% agave tequilas.

99.    These misrepresentations of fact concerned the type of information upon which Plaintiffs and other reasonable consumers would be expected to rely in making their decisions to purchase Diageo's Products.

100.    Consequently, Plaintiffs and the Nationwide Class have suffered injury by purchasing Diageo's Products and not receiving what was advertised.

## <u>COUNT III – UNJUST ENRICHMENT</u>
### (On behalf of Plaintiffs and the Nationwide Class against Defendants)

101.    Plaintiffs incorporate by reference paragraphs 1 through 83 as though fully set forth herein.

102.    Plaintiffs and the Nationwide Class members conferred benefits upon Diageo.

103.    Plaintiffs and the Nationwide Class members paid money for the Products, which they would not have purchased or would not have purchased at the same price, had they known that they were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

104.    Diageo has unjustly retained the benefits conferred upon by Plaintiffs and the Nationwide Class members.

105.    Diageo retained those benefits under circumstances that make it inequitable for Diageo to retain such benefits.

106.    Diageo retained these benefits even though the Products were enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave.

107.    If Plaintiffs and Nationwide Class members had known the true nature of the Products, they would not have purchased the Products.

## COUNT IV – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *ET SEQ.*
**(On behalf of Plaintiff, Nabil Haschemie and the Florida Subclass against Defendants)**

108.    Plaintiff, Mr. Haschemie incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

109.    Mr. Haschemie and the Florida Subclass members are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. § 501.203 (7), (8), Fla. Stat.

110.    Diageo engages in "trade or commerce" within the meaning of FDUTPA. § 501.203(8), Fla. Stat.

111.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

112.    Diageo engaged in unfair and deceptive trade practices that violated FDUTPA, by representing that their Products were 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

113.    Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

114.    Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

115.    Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

116.    Diageo intended for Mr. Haschemie and the Florida Subclass members to rely on its misrepresentations and omissions so that Mr. Haschemie and the Florida Subclass members would purchase the Products.

117.    Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. Haschemie and the Florida Subclass members, about the quality and true value of the Products.

118.    Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Haschemie and the Florida Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

119.    Diageo knew or should have known that its conduct violated the FDUTPA.

120.    Mr. Haschemie and the Florida Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Haschemie and the Florida Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

121.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Mr. Haschemie and the Florida Subclass members.

122.    Mr. Haschemie and the Florida Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products. Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Mr. Haschemie and the Florida Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

123.    As a direct and proximate result of Diageo's violations of FDUTPA, Mr. Haschemie and the Florida Subclass members have suffered injury-in-fact and actual damages.

124.    Mr. Haschemie and the Florida Subclass members are entitled to recover their actual damages under § 501.211(2), Fla. Stat. and attorneys' fees under § 501.2105(1), Fla. Stat.

125.    Mr. Haschemie and the Florida Subclass members have suffered and will continue to suffer irreparable harm if Diageo continues to engage in such deceptive, unfair, and unreasonable practices.

126.    Mr. Haschemie, on behalf of the Florida Subclass, requests that the Court award them actual damages and issue an order requiring Diageo to properly notify the Florida Subclass members of the true nature of how the tequila Products are made and the amount of Blue Weber agave used to make them, as well as award Mr. Haschemie and Florida Subclass members' attorneys' fees; and any other just and proper relief available under FDUTPA.

127.    Mr. Haschemie, on behalf of the Florida Subclass, further seeks an injunction to prohibit Diageo from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein.

## COUNT V – VIOLATION OF HAWAII'S FALSE ADVERTISING LAW – H.R.S. § 708-871, *ET SEQ.*
### (On behalf of Plaintiff, Francisco Javier Barberi and the Hawaii Subclass against Defendants)

128.    Plaintiff, Mr. Barberi incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

129.    Mr. Barberi brings this cause of action on behalf of himself and the Hawaii Subclass members.

130.    Hawaii's False Advertising Law ("HFAL") provides that:

> A person commits the offense of false advertising if, in connection with the promotion of the sale of property or services, the person knowingly or recklessly makes or causes to be made a false or misleading statement in any advertisement addressed to the public or to a substantial number of persons.

H.R.S. § 708-871.

131.    Defendants have knowingly and recklessly made false and misleading statements to the public, including Mr. Barberi and the Hawaii Subclass members, through Defendants' deceptive marketing, that the Products are 100% Blue Weber agave tequilas. These representations were misleading because the Products were adulterated and are not 100% Blue Weber agave tequilas. Because Defendants disseminated misleading information regarding its tequila, and Defendants know, knew, or should have known through the exercise of reasonable care that the representation was misleading, Defendants have violated the HFAL.

132.    Furthermore, Defendants know, knew or should have known through the exercise of reasonable care that such representations were unauthorized and misleading.

133.    As a result of Defendants' false advertising, Defendants have fraudulently obtained money from Mr. Barberi and the Hawaii Subclass members.

134.     Mr. Barberi requests that this Court cause Defendants to restore this fraudulently obtained money to Mr. Barberi and the Class Members, to disgorge the profits Defendants made on these transactions, and to enjoin Defendants from violating the HFAL or violating it in the same fashion in the future as discussed herein.  Otherwise, Mr. Barberi and the Hawaii Subclass members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### COUNT VI – VIOLATION OF HAWAII'S UNFAIR COMPETITION LAW – H.R.S. § 480, *ET SEQ.*
### (On behalf of Plaintiff, Francisco Javier Barberi and the Hawaii Subclass against Defendants)

135.     Plaintiff, Mr. Barberi incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

136.     Mr. Barberi and the Hawaii Subclass members are "consumer[s]" engaged in trade or commerce within the meaning of §480-1. H.R.S. § 480-1.

137.     Diageo engages in "trade or commerce" within the meaning of §480-2. H.R.S. § 480-2.

138.     Hawaii's unfair competition law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." H.R.S. § 480-2.

139.     Diageo engaged in unfair and deceptive trade practices that violated § 480-2, by representing that their Products were 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

140.     Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

141.     Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

142.    Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

143.    Diageo intended for Mr. Barberi and the Hawaii Subclass members to rely on its misrepresentations and omissions so that Mr. Barberi and the Hawaii Subclass members would purchase the Products.

144.    Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. Barberi and the Hawaii Subclass members, about the quality and true value of the Products.

145.    Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Barberi and the Hawaii Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

146.    Diageo knew or should have known that its conduct violated § 480-2.

147.    Mr. Barberi and the Hawaii Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Barberi and the Hawaii Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

148.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Mr. Barberi and the Hawaii Subclass members.

149.    Mr. Barberi and the Hawaii Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products.  Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products.  Mr. Barberi and the Hawaii Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

150.    As a direct and proximate result of Diageo's violations of § 480-2, Mr. Barberi and the Hawaii Subclass members have suffered injury-in-fact and actual damages.

151.    Mr. Barberi and the Hawaii Subclass members are entitled to recover their actual damages and attorneys' fees under § 480-13.

152.    Mr. Barberi and the Hawaii Subclass members have suffered and will continue to suffer irreparable harm if Diageo continues to engage in such deceptive, unfair, and unreasonable practices.

153.    Mr. Barberi, on behalf of the Hawaii Subclass, requests that the Court award them actual damages and issue an order requiring Diageo to properly notify the Hawaii Subclass members of the true nature of how the tequila Products are made and the amount of Blue Weber agave used to make them, as well as award Mr. Barberi and Hawaii Subclass members' attorneys' fees; and any other just and proper relief available under § 480-13.

154.    Mr. Barberi, on behalf of the Hawaii Subclass, seeks an injunction to prohibit Diageo from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein.

**COUNT VII – VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT – LA. REV. STAT. ANN. §§ 51:1401-1419**
**(On behalf of Plaintiff, Alex Katz and the Louisiana Subclass against Defendants)**

155.   Plaintiff, Mr. Katz incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

156.   Mr. Katz and the Louisiana Subclass members are "consumer[s]" within the meaning of §1402(1) of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUPTA"). *See* La. Rev. Stat. Ann. § 51:1402(1).

157.   Diageo engages in "trade or commerce" within the meaning of LUPTA. *See* La. Rev. Stat. Ann. § 51:1402(10).

158.   LUPTA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A).

159.   Diageo engaged in unfair and deceptive trade practices that violated LUPTA, by representing that their Products were 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

160.   Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

161.   Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

162.   Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

163.    Diageo intended for Mr. Katz and the Louisiana Subclass members to rely on its misrepresentations and omissions so that Mr. Katz and the Louisiana Subclass members would purchase the Products.

164.    Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. Katz and the Louisiana Subclass members, about the quality and true value of the Products.

165.    Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Katz and the Louisiana Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

166.    Diageo further falsely advertised the Products as 100% agave despite knowing that was false.

167.    Diageo knew or should have known that its conduct violated LUPTA.

168.    Mr. Katz and the Louisiana Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Katz and the Louisiana Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

169.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Mr. Katz and the Louisiana Subclass members.

170.     Mr. Katz and the Louisiana Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products.  Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products.  Mr. Katz and the Louisiana Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

171.     As a direct and proximate result of Diageo's violations of LUPTA, Mr. Katz and the Louisiana Subclass members have suffered injury-in-fact and actual damages.

172.     Mr. Katz and the Louisiana Subclass members are entitled to recover their actual damages and attorneys' fees under § 51:1409 of LUPTA.

### COUNT VIII – VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT - 815 ILCS § 505 ET SEQ.
**(On behalf of Plaintiff, Jeffrey Schneider and the Illinois Subclass against Defendants)**

173.     Plaintiff, Mr. Schneider incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

174.     Mr. Schneider and the Illinois Subclass members are "consumer[s]" within the meaning of §505/1(e) of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").  *See* 815 ILCS § 505/2.

175.     Diageo engages in "trade" or "commerce" within the meaning of ICFA. See 815 ILCS § 505/1(f).

176.     ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce." *See* 815 ILCS § 505/2. The ICFA provides a non-exhaustive list of prohibited acts or practices including, but not limited to, the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon

the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). *See id.*; *see also* 815 ILCS § 510/2. Section 2 of the UDTPA provides, in relevant part, that a person engages in deceptive trade practices in the course of business when the person: (i) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods; (ii) uses deceptive representations or designations of geographic origin in connection with goods; (iii) represents that goods have characteristics, ingredients, or quantities that they do not have; (iv) represents that goods are of a particular standard, quality, or grade, if they are of another; and (v) advertises goods with the intent to not sell them as advertised. *See* 815 ILCS § 510/2.

177.    Diageo engaged in unfair and deceptive trade practices that violated ICFA and UDTPA, by representing, advertising, and labeling their Products as 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

178.    Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

179.    Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

180.    Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

181.    Diageo intended for Mr. Schneider and the Illinois Subclass members to rely on its misrepresentations and omissions so that Mr. Schneider and the Illinois Subclass members would purchase the Products.

182.    Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. Schneider and the Illinois Subclass members, about the quality and true value of the Products.

183.    Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Schneider and the Illinois Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

184.    Diageo knew or should have known that its conduct violated ICFA and UDTPA.

185.    Mr. Schneider and the Illinois Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Schneider and the Illinois Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

186.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used, was material to Mr. Schneider and the Illinois Subclass members.

187.    Mr. Schneider and the Illinois Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products. Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Mr. Schneider and the Illinois Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

188.    As a direct and proximate result of Diageo's violations of ICFA and UDTPA, Mr. Schneider and the Illinois Subclass members have suffered injury-in-fact and actual damages.

189.    Mr. Schneider and the Illinois Subclass members are entitled to recover their actual damages and attorneys' fees under UDTPA.

### COUNT IX – VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT - CAL. CIV. CODE § 1750, *ET SEQ.*
**(On behalf of Plaintiff, Bryan Armbruster and the California Subclass against Defendants)**

190.    Plaintiff, Mr. Armbruster incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

191.    Mr. Armbruster brings this claim for himself and on behalf of the California Subclass under California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code. § 1750 *et seq*.

192.    The Products are "goods" within the meaning of Cal. Civ. Code. § 1761(a).

193.    Mr. Armbruster and the California Subclass members are "person[s]" and "consumer[s]" engaged in commerce within the meaning of § 1761(c), (d).

194.    The purchase of Products by Mr. Armbruster and the California Subclass members constitute "transaction[s]" within the meaning of § 1761(e).

195.    The CLRA prohibits the "unfair methods of competition and unfair or deceptive acts or practices listed in § 1770(a) undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code. § 1770(a).

196.    Diageo violated § 1770(a) by: (i) "[m]isrepresenting the source, sponsorship, approval, or certification of goods"; (ii) "[m]isrepresenting the affiliation, connection, or association with, or certification by, another"; (iii) "[u]sing deceptive representations or designations of geographic origin in connection with goods"; (iv) [r]epresenting that goods or

services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; (v) "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; (vi) "[a]dvertising goods or services with intent to not sell them as advertised"; and (vii) "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code. § 1770(a)(2), (3), (4), (5), (7), (9), and (16).

197.    Diageo's unfair and deceptive acts or practices occurred repeatedly in Diageo's course of trade or business, were material, and were capable of deceiving a significant portion of the general consuming public.

198.    Diageo knew that despite being marketed, certified, advertised, and labeled 100% Agave, the Products were adulterated or improperly enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory.

199.    Diageo owed a duty to Mr. Armbruster and the California Subclass members to disclose that the Products are not 100% agave because it possessed exclusive knowledge that the Products were adulterated, intentionally concealed the true nature of the Products, and made misleading representations regarding the source of the sugars used in the Products.

200.    In failing to disclose the true nature of the Products, Diageo knowingly and intentionally concealed material facts and breached its duty to Mr. Armbruster and the California Subclass members. Diageo knew or should have known that its conduct would mislead consumers about the true nature of the Products.

201.    Diageo's knowing and intentional misrepresentations and omissions were material in that a reasonable consumer would have considered them important in deciding whether to purchase the Products.

202.    Mr. Armbruster and the California Subclass members purchased the Products in reliance on Diageo's knowing and intentional misrepresentations and omissions. Indeed, Mr. Armbruster reviewed, considered, and relied on Diageo's representations that the Products were 100% agave in deciding whether to purchase them. Mr. Armbruster's and the California Subclass members' reliance was reasonable.

203.    Absent Diageo's misrepresentations and omissions, Mr. Armbruster and the California Subclass members would not have purchased the Products or would not have paid premium prices for the Products.

204.    Had Diageo accurately disclosed the truth about the Products through the same advertising mediums it advertised them as 100% agave, Mr. Armbruster and the California Subclass members would have reviewed and considered those disclosures.

205.    As a result of Diageo's unfair and deceptive acts or practices, Mr. Armbruster and the California Subclass members suffered actual damages in that the adulterated Products were not 100% agave, and therefore, were not worth the premium price Mr. Armbruster and California Subclass members paid.

206.    Mr. Armbruster and the California Subclass members seek an order enjoining Diageo's unfair and deceptive acts or practices, equitable relief, and award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other non-monetary relief available under the CLRA. Mr. Armbruster and members of the public will suffer irreparable injury without an injunction, as they have an interest in buying the Products in the future, as currently labeled, but have no way of determining whether they are made with 100% agave.

207.    Mr. Armbruster has sent a notice letter to Diageo in accordance with Cal. Civ. Code. § 1782(a), notifying Diageo of its alleged violations of § 1770(a) and demanding that Diageo

correct or agree to correct the actions described therein within thirty (30) days of the notice. If Diageo fails to do so, Mr. Armbruster will seek leave to amend to include compensatory and monetary damages to which Mr. Armbruster and the California Subclass members are entitled under the CLRA.

208.    Mr. Armbruster pleads this claim separately as well as in the alternative to his claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Mr. Armbruster has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

### COUNT X – VIOLATIONS OF CALIFORNIA'S FALSE ADVERTISING LAW
### CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*
**(On behalf of Plaintiff, Bryan Armbruster and the California Subclass against Defendants)**

209.    Plaintiff, Mr. Armbruster incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

210.    Mr. Armbruster brings this claim for himself and on behalf of the California Subclass members against Diageo.

211.    California's False Advertising Law ("FAL") makes its "unlawful for any person, firm, corporation or association . . . to make or disseminate or cause to be made or disseminated . . . any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

212.    Diageo caused to be made or disseminated throughout California, through advertising, marketing, and other publications, untrue and misleading statements that the Products

are 100% agave. Diageo's untrue and misleading statements were likely to deceive a significant portion of the general consuming public.

213.     Diageo knew that the Products were adulterated or improperly enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory, and should not have been certified, labeled, marketed, and/or advertised as 100% agave.

214.     Diageo was under a duty to Mr. Armbruster and the California Subclass members to disclose that the Products are not 100% agave because it possessed exclusive knowledge that the Products were adulterated, intentionally concealed the foregoing from Mr. Armbruster and the California Subclass members, and made misleading and incomplete representations regarding the true nature of the Products.

215.     In failing to disclose the true nature of the Products, Diageo knowingly and intentionally concealed material facts and breached its duty to Mr. Armbruster and the California Subclass members. Diageo knew or should have known that its conduct would mislead consumers about the true nature of the Products.

216.     Diageo's knowing and intentional misrepresentations and omissions are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Products at a premium price point.

217.     Mr. Armbruster purchased the Products in reliance on Diageo's knowing and intentional misrepresentations and omissions. That reliance was reasonable, as they had no way of discerning that Diageo's representations were false and misleading, or otherwise learning the true nature of the Products.

218.    Absent Diageo's misrepresentations and omissions, Mr. Armbruster and the California Subclass members would not have purchased the Products or would have paid less than they did for them.

219.    Had Diageo adequately disclosed the truth about the Products through the same advertising mediums it advertised them as 100% agave, Plaintiff would have seen and considered those disclosures in determining whether to purchase the Products.

220.    As a direct and proximate result of Diageo's misrepresentations and omissions, consumers have been and are being harmed. Mr. Armbruster and the California Subclass members have suffered injury and actual out-of-pocket losses as a result of Diageo's FAL violations.

221.    Mr. Armbruster and the California Subclass members seek an order enjoining the practices described herein under Cal. Bus. & Prof. Code § 17535, awarding any other non-monetary relief available under the FAL, and awarding attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5. Mr. Armbruster and members of the public will suffer irreparable injury without an injunction, as they have an interest in buying the Products in the future, as currently labeled, but have no way of determining whether they are made with 100% agave.

222.    Mr. Armbruster has sent a notice letter to Diageo in accordance with Cal. Civ. Code. § 1782(a), notifying Diageo of its alleged FAL violations and demanding that Diageo correct or agree to correct the actions described therein within thirty (30) days of the notice. If Diageo fails to do so, Mr. Armbruster will seek leave to amend to include compensatory and monetary damages to which Mr. Armbruster and the California Subclass members are entitled.

223.    Mr. Armbruster pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Plaintiff has no adequate remedy

at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

## COUNT XI – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*
**(On behalf of Plaintiff, Bryan Armbruster and the California Subclass against Defendants)**

224.    Plaintiff, Mr. Armbruster incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

225.    Mr. Armbruster brings this claim for himself and on behalf of the California Subclass against Diageo.

226.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

227.    Diageo's conduct, as described herein, was and is unfair, deceptive, and unlawful, in violation of the UCL.

228.    Diageo knew that the Products were adulterated or improperly enhanced with sugars other than those obtained from the *tequilana weber* blue variety of agave grown in a specific, defined territory, and should not have been certified, labeled, marketed, and/or advertised as 100% agave.

229.    Diageo was under a duty to Mr. Armbruster and the California Subclass members to disclose that the Products were not 100% agave because it possessed exclusive knowledge that the Diageo Premium Tequila Products were adulterated with non-agave alcohol, intentionally

concealed the foregoing from Plaintiff and California Subclass members, and made misleading and incomplete representations regarding the agave sugar content of the Products.

230.    Diageo's conduct was unfair, unlawful or fraudulent in at least the following ways: (i) by knowingly and intentionally failing to disclose that the Products were adulterated; (ii) by knowingly and intentionally misrepresenting the Products as 100% agave, as defined by applicable regulations; and (iii) by knowingly and intentionally labeling, advertising, and otherwise selling the Products as 100% agave despite being adulterated.

231.    Diageo's knowing and intentional misrepresentations and omissions alleged herein were intended to cause, and did cause, Mr. Armbruster and the California Subclass members to make their purchases of the Products. Diageo knew or should have known that its conduct would mislead consumers about the true nature of the Products.

232.    Mr. Armbruster and the California Subclass members purchased the Products in reliance on Diageo's knowing and intentional misrepresentations and omissions regarding the nature of the Products. That reliance was reasonable, as they had no way of discerning that Diageo's representations regarding the nature of the Products were false and misleading, or of otherwise reasonably learning the true nature of the Diageo Products.

233.    Absent Diageo's misrepresentations and omissions, Mr. Armbruster and the California Subclass members would not have purchased the Products or would have paid less for them.

234.    Had Diageo adequately disclosed the truth about the Products through the same advertising mediums it advertised them as 100% agave, Mr. Armbruster would have seen and considered those disclosures in determining whether to purchase the Products.

235.    Accordingly, Mr. Armbruster and the California Subclass members have suffered ascertainable loss and actual damages as a direct and proximate result of Diageo's misrepresentations, their concealment of and failure to disclose material information, and their unlawful and unfair conduct.

236.    Additionally, Diageo's acts and practices described above are unfair under the UCL because they offend established public policy regarding misleading advertising and the harm caused to consumers greatly outweighs any benefits associated with those practices. Diageo's conduct has also impaired competition within the premium tequila market and has prevented Mr. Armbruster and the California Subclass members from making fully informed decisions about whether to purchase the Products and/or pay premium prices for them.

237.    Diageo's conduct, as described herein, was and is unlawful in violation of the UCL in that Diageo violated the laws alleged above, including California consumer protection laws. Further, Diageo's conduct is unlawful under the UCL in that Diageo violated California's Sherman Food, Drug, and Cosmetic Law (Cal. Health & Safety Code § 109875, *et seq*.), which prohibits misbranding "food," including alcoholic beverages. *See* Cal. Health & Safety Code § 109935; *id.* § 110660.

238.    Mr. Armbruster seeks an injunction enjoining Diageo's misconduct alleged herein. Mr. Armbruster and members of the public will suffer irreparable injury without an injunction, as they have an interest in buying the Products in the future, as currently labeled, but have no way of determining whether they are made with 100% agave.

239.    Mr. Armbruster has sent a notice letter to Diageo in accordance with Cal. Civ. Code. § 1782(a), notifying Diageo of its alleged violations described herein and demanding that Diageo correct or agree to correct these actions within thirty (30) days of the notice. If Diageo fails

to do so, Mr. Armbruster will seek leave to amend to include compensatory and monetary damages to which Mr. Armbruster and the California Subclass members are entitled.

240.    Mr. Armbruster pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Mr. Armbruster has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above, absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

### COUNT XII – VIOLATIONS OF COLORADO CONSUMER PROTECTION ACT – CO REV STAT § 6-1-101, 6-1-105, *ET SEQ.*
**(On behalf of Plaintiff, Samuel Gemus and the Colorado Subclass against Defendants)**

241.    Plaintiff, Mr. Gemus incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

242.    Mr. Gemus and the Colorado Subclass members are consumers within the meaning of the Colorado Consumer Protection Act ("CCPA").

243.    Diageo is a person that engages in trade or commerce within the meaning of the CCPA. *See* Co. Rev. Stat. § 6-1-102(6).

244.    The CCPA prohibits unfair methods of competition and unfair or deceptive trade practices in the conduct of any trade or commerce or otherwise in the course of the person's business. *See* Co. Rev. Stat. § 6-1-102(6).

245.    The CCPA provides, in relevant part, that a person engages in a deceptive trade practice when, in the course of the person's business, the person: (i) either knowingly or recklessly makes a false representation as to the source, sponsorship, approval, or certification of goods; (ii) uses deceptive representations or designations of geographic origin in connection with goods; (iii)

either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods; (iv) represents that goods are of a particular standard, quality, or grade, or that goods are of a particular style or model, if the person knows or should know that they are of another; and (v) advertises goods, services, or property with intent not to sell them as advertised. *See* Co. Rev. Stat. § 6-1-105 (1)(b), (d), (e), (g), and (i).

246.    Diageo engaged in unfair and deceptive trade practices that violated CCPA, by representing, advertising, and labeling their Products as 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

247.    Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers.

248.    Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

249.    Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

250.    Diageo intended for Mr. Gemus and the Colorado Subclass members to rely on its misrepresentations and omissions so that Mr. Gemus and the Colorado Subclass members would purchase the Products.

251.    Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact,

deceive reasonable consumers, including Mr. Gemus and the Colorado Subclass members, about the quality and true value of the Products.

252.    Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Gemus and the Colorado Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

253.    Diageo knew or should have known that its conduct violated CCPA.

254.    Mr. Gemus and the Colorado Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Gemus and the Colorado Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety Agave grown in the requisite territory.

255.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Mr. Gemus and the Colorado Subclass members.

256.    Mr. Gemus and the Colorado Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products.  Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Mr. Gemus and the Colorado Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

257.    Diageo's conduct has had a significant public impact and its conduct is not limited to isolated instances. Upon information and belief, Diageo's conduct is ongoing, widespread, and continuous given that it affects all Casamigos Tequilas and Don Julio Tequilas because each line is made from the same, respective, affected base spirit.

258.    As a direct and proximate result of Diageo's violations of the CCPA, Mr. Gemus and the Colorado Subclass members have suffered injury-in-fact and actual damages.

259.    Mr. Gemus and the Colorado Subclass members are entitled to recover their actual damages, or treble damages given Diageo's bad faith conduct, and attorneys' fees under the CCPA. *See* Co. Rev. Stat. § 6-1-113.

## COUNT XIII – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT – TEX. BUS. & COM. § 17.41, *ET SEQ.*
### (On behalf of Plaintiff, Justin Frank Harkness and the Texas Subclass against Defendants)

260.    Plaintiff, Mr. Harkness incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

261.    Mr. Harkness and the Texas Subclass members are "consumers" engaged in commerce within the meaning of the Texas Deceptive Trade Practices Act ("DTPA"). *See* Tex. Bus. & Com. § 17.45(4).

262.    Diageo is a person that engages in "trade" or "commerce" within the meaning of the DTPA. *See* Tex. Bus. & Com. § 17.45(6).

263.    The DTPA prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." *See* Tex. Bus. & Com. § 17.46.

264.    The DTPA provides, in relevant part, a non-exhaustive list of conduct that amounts to  a deceptive trade practice in the course of the person's business: (i) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (ii) uses deceptive representations or designations of geographic origin in connection with goods; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have; (iv) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

another; and (v) advertising goods or services with intent not to sell them as advertised. *See* Tex. Bus. & Com. § 17.46(b)(2), (4), (5), (7), and (9).

265.    Diageo engaged in unfair and deceptive trade practices that violated DTPA, by representing, advertising, and labeling their Products as 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

266.    Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers. Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

267.    Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

268.    Diageo intended for Mr. Harkness and the Texas Subclass members to rely on its misrepresentations and omissions so that Mr. Harkness and the Texas Subclass members would purchase the Products.

269.    Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. Harkness and the Texas Subclass members, about the quality and true value of the Products.

270.    Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Harkness and the Texas Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

271.    Diageo knew or should have known that its conduct violated DTPA.

272.    Mr. Harkness and the Texas Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Harkness and the Texas Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety Agave grown in the requisite territory.

273.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used, was material to Mr. Harkness and the Texas Subclass members.

274.    Mr. Harkness and the Texas Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products.  Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products.  Mr. Harkness and the Texas Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

275.    As a direct and proximate result of Diageo's violations of the DTPA, Mr. Harkness and the Texas Subclass members have suffered injury-in-fact and actual damages.

276.    Mr. Harkness and the Texas Subclass members seek an order enjoining Diageo's unfair and deceptive acts or practices, equitable relief, and award of attorneys' fees and costs under Tex. Bus. & Com. § 17.50, and any other non-monetary relief available under the DTPA. Mr. Harkness and members of the public will suffer irreparable injury without an injunction, as they

have an interest in buying the Products in the future, as currently labeled, but have no way of determining whether they are made with 100% agave.

277.    Mr. Harkness has sent a notice letter to Diageo in accordance with § 17.505 of the DTPA, notifying Diageo of its alleged violations described herein and demanding that Diageo correct or agree to correct these actions within sixty (60) days of the notice. If Diageo fails to do so, Mr. Harkness will seek leave to amend to include compensatory and monetary damages to which Mr. Harkness and the Texas Class member are entitled under the DTPA.

278.    Mr. Harkness pleads this claim separately as well as in the alternative to his claims for damages under Fed. R. Civ. P. 8(a)(3). Additionally, Mr. Harkness has no adequate remedy at law for the future unlawful acts, methods, or practices as set forth above absent an injunction. Moreover, Diageo's alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

### COUNT XIV – VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT – GA. CODE § 10-1-390, *ET SEQ.*
**(On behalf of Plaintiff, Leo Suarez and the Georgia Subclass against Defendants)**

279.    Plaintiff, Mr. Suarez incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

280.    Mr. Suarez and the Georgia Subclass members are "consumers" engaged in "consumer transactions" or commerce within the meaning of the Georgia Fair Business Practices Act ("FBPA"). *See* Ga. Code § 10-1-392(a)(6), (10).

281.    Diageo engages in "trade" or "commerce" within the meaning of the FBPA. *See* GA Code § 10-1-392(a)(28).

282.    The FBPA prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions or consumer acts or practices in trade or commerce." *See* Ga. Code § 10-1-393(a).

283.    The FBPA provides, in relevant part, a non-exhaustive list of practices declared unlawful under the FBPA, such as: (i) causing actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (ii) using deceptive representations or designations of geographic origin in connection with goods; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; (iv) representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; and (v) advertising goods or services with intent not to sell them as advertised. *See* Ga. Code § 10-1-393(b)(2), (4), (5), (7), and (9).

284.    Diageo engaged in unfair and deceptive trade practices that violated the FBPA, by representing, advertising, and labeling their Products as 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

285.    Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers. Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

286.    Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and

misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

287. Diageo intended for Mr. Suarez and the Georgia Subclass members to rely on its misrepresentations and omissions so that Mr. Suarez and the Georgia Subclass members would purchase the Products.

288. Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. Suarez and the Georgia Subclass members, about the quality and true value of the Products.

289. Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. Suarez and the Georgia Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

290. Diageo knew or should have known that its conduct violated the FBPA.

291. Mr. Suarez and the Georgia Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. Suarez and the Georgia Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety agave grown in the requisite territory.

292. Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Mr. Suarez and the Georgia Subclass members.

293.    Mr. Suarez and the Georgia Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products.  Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Mr. Suarez and the Georgia Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

294.    As a direct and proximate result of Diageo's violations of the FBPA, Mr. Suarez and the Georgia Subclass members have suffered injury-in-fact and actual damages.

295.    Mr. Suarez and the Georgia Subclass members are entitled to recover their actual damages and attorneys' fees under the FBPA. *See* Ga. Code § 10-1-399.

296.    Mr. Suarez and the Georgia Subclass members seek an order enjoining Diageo's unfair and deceptive acts or practices, equitable relief, and award of attorneys' fees and costs under Ga. Code § 10-1-399, and any other non-monetary relief available under the FBPA. Mr. Suarez and members of the public will suffer irreparable injury without an injunction, as they have an interest in buying the Products in the future, as currently labeled, but have no way of determining whether they are made with 100% agave.

297.    Mr. Suarez has sent a notice letter to Diageo in accordance with Ga. Code § 10-1-399, notifying Diageo of the alleged violations described herein and demanding that Diageo correct or agree to correct these actions within thirty (30) days of the notice. If Diageo fails to do so, Mr. Suarez will seek leave to amend to include compensatory and monetary damages to which Mr. Suarez and the Georgia Subclass members are entitled under the FBPA.

## COUNT XV – VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW – 73 P.S. §201-1, *ET SEQ.*
### (On behalf of Plaintiff, Jonathan McDonald and the Pennsylvania Subclass against Defendants)

298.    Plaintiff. Mr. McDonald incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

299.    Mr. McDonald and the Pennsylvania Subclass members are persons engaged in commerce within the meaning of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See* 73 P.S. § 201-2(2); 73 P.S. § 201-9.2(a).

300.    Diageo engages in "trade" or "commerce" within the meaning of the UTPCPL. *See id.*

301.    The UTPCPL prohibits "unfair methods of competition" and "unfair or deceptive acts or practices" in trade or commerce. *See id.* at § 201-2(3)-(4).

302.    The UTPCPL provides, in relevant part, a non-exhaustive list of practices declared unlawful under the UTPCPL, such as: (i) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services; (ii) using deceptive representations or designations of geographic origin in connection with goods; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have; (iv) representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and (v) advertising goods or services with intent not to sell them as advertised. *See* 73 P.S. § 201-2(b)(2), (4), (5), (7), and (9).

303. Diageo engaged in unfair and deceptive trade practices that violated the UTPCPL by representing, advertising, and labeling their Products as 100% agave, ultra-premium, pure tequila made of 100% Blue Weber agave.

304. Diageo knew or should have known that its representations of the nature and composition of its Products were false but failed to disclose this information to consumers. Diageo knew that such information was material to consumer transactions and consumers' decisions to purchase the Products.

305. Diageo actively concealed and misrepresented the true nature of how their Products were manufactured and composition of their Products. Indeed, Diageo concealed and misrepresented that it had in fact utilized sugars other than those obtained from the *tequilana weber* blue variety of agave to enhance its tequila, despite the Products being labeled as 100% agave.

306. Diageo intended for Mr. McDonald and the Pennsylvania Subclass members to rely on its misrepresentations and omissions so that Mr. McDonald and the Pennsylvania Subclass members would purchase the Products.

307. Diageo's unfair or deceptive acts or practices, including concealing, omitting, or suppressing material facts about the composition of the Products had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to, and did in fact, deceive reasonable consumers, including Mr. McDonald and the Pennsylvania Subclass members, about the quality and true value of the Products.

308. Diageo intentionally and knowingly misrepresented or omitted material facts regarding the use of Blue Weber agave with an intent to mislead Mr. McDonald and the Pennsylvania Subclass members into believing that 100% Blue Weber agave was used to ferment the Products.

309.    Diageo knew or should have known that its conduct violated the UTPCPL.

310.    Mr. McDonald and the Pennsylvania Subclass members were and are injured as a result of Diageo's conduct because they paid to own and enjoy 100% agave, ultra-premium, tequilas. Instead, Mr. McDonald and the Pennsylvania Subclass members received and overpaid for agave spirits whose fermentation was enhanced by sugars other than those obtained from the *tequilana weber* blue variety Agave grown in the requisite territory.

311.    Diageo's failure to disclose, and active concealment of, the sugars used to ferment the Products, inclusive of the actual amount of Blue Weber agave actually used was material to Mr. McDonald and the Pennsylvania Subclass members.

312.    Mr. McDonald and the Pennsylvania Subclass members have suffered ascertainable losses as a result of Diageo's misrepresentations and omissions about the Products. Had they been aware of the true nature of and composition of the Products, they either would have paid less for the Products or would not have purchased the Products. Mr. McDonald and the Pennsylvania Subclass members did not receive the benefit of their bargain due to Diageo's misconduct.

313.    As a direct and proximate result of Diageo's violations of the UTPCPL, Mr. McDonald and the Pennsylvania Subclass members have suffered injury-in-fact and actual damages.

314.    Mr. McDonald and the Pennsylvania Subclass members are entitled to recover their actual damages, or up to three times their actual damages sustained, and attorneys' fees under the UTPCPL. *See* 73 P.S. § 201-9.2(a).

## VIII.  <u>CLAIMS FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully request that the Court:

a.  Certify the proposed Classes, appoint Plaintiffs as the class representatives, appoint Plaintiffs' Counsel as Class Counsel, and make such further orders for the protection of Class Members as the Court deems appropriate;

b.  Enjoin Diageo from engaging in the unlawful conduct alleged herein, and order such other injunctive relief that the Court deems just and proper;

c.  Award compensatory damages to Plaintiff and the Class Members, including punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial, except that monetary relief under the CLRA, the DTPA and the FBPA, as stated above, shall be limited prior to completion of the applicable notice requirements;

d.  Award Plaintiffs and Class Members pre-judgment and post-judgment interest, as provided by law,

e.  Award Plaintiffs and Class Members their reasonable attorneys' fees and costs as allowed by law;

f.  Enter an order holding Diageo financially responsible for all Class notice and the administration of Class relief;

g.  Order Plaintiffs and the Class Members any other relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to *Fed. R. Civ. P.* 38(b), Plaintiffs demand a jury trial for any and all issues triable

by a jury.

Dated: August 18, 2025.

Respectfully submitted,

**RENNERT VOGEL MANDLER &
RODRIGUEZ, P.A**.
*Counsel for Plaintiffs
and the Proposed Class*
Miami Tower, Suite 2900
100 S.E. Second Street
Miami, Florida 33131
Telephone (305) 577-4177
servicedanielmaland@rvmrlaw.com
servicesandramejia@rvmrlaw.com

*/s/ Daniel S. Maland*
Daniel S. Maland, Esq.
Florida Bar No. 114932
dmaland@rvmrlaw.com
Sandra E. Mejia, Esq.
Florida Bar No. 1026047
smejia@rvmrlaw.com